**STATE of Tennessee, Appellee,**

v.

**Rita G. JOYNER, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

Sept. 30, 1987.

Permission to Appeal Denied by Supreme Court Feb. 1, 1988.

Norma Crippen Ballard, Asst. Atty. Gen., Nashville, Chris Craft, Asst. Dist. Atty. Gen., Memphis, for appellee.

James F. Schaeffer, Memphis, for appellant.

## OPINION

DAUGHTREY, Judge.

The defendant, Rita G. Joyner, was charged in a one-count indictment with violation of the 1983 Computer Crimes Act, TCA §§ 39–3–1401 et seq. She was convicted by a jury and sentenced to serve one year in the local workhouse, to be followed by a probation period of five years. She appeals, claiming (1) that the trial judge should have entered a judgment of acquittal because the indictment was "overly broad and too vague to allow the defendant and defense counsel to defend the charge brought against her," and because the statute itself is "unconstitutionally overbroad and vague"; (2) that the evidence is insufficient to support the verdict; and (3) that the jury instructions were erroneous because they did not "accurately define the offense" of computer fraud. We find no reversible error and affirm.

## I. *Sufficiency of the Charge*

■ The Computer Crimes Act of 1983 was enacted for the express purpose of combatting "computer-related crime," which the legislature described as "a potential problem in business and government" with losses "far greater than [those] associated with ... other white collar crime." TCA § 39–3–1402(1) and (2). The statute provides, in pertinent part,[1] as follows:

(a) Whoever knowingly and willfully, directly or indirectly, accesses, causes to be accessed, or attempts to access any computer software, computer program, data, computer, computer system, computer network, or any part thereof, for the purpose of:

(1) Devising or executing any scheme or artifice to defraud; or

(2) Obtaining money, property, or services for themselves or another by means of false or fraudulent pretenses, representations, or promises shall, upon conviction thereof, be fined a sum of not more than fifty thousand dollars ($50,-000) or imprisoned not less than three (3) nor more than ten (10) years, or both.

Certainly, the provision in subsection (a) is not artfully drawn. For one thing, it is composed of a single sentence, whose subject ("whoever") and verb ("shall be fined or imprisoned") are separated by 63 words. Among those 63 words are two enumerated clauses that appear, facially at least, to set out two separate crimes. But the clauses in (a)(1) and (2) cannot constitute independent offenses, because there is no separate penalty provision for (a)(1). Instead, we conclude that the two clauses must be read together to describe alternate means of committing a single offense, despite the use of the disjunctive "or" between clauses

(a)(1) and (2). The latter interpretation makes the provisions of (a)(1) and (2) technically redundant, but it gives a fuller description of the crime. Indeed, it is this interpretation of subsection (a) that the trial judge used in his charge to the jury. See Section III, below.

Prior to trial the defendant raised no challenge to the constitutionality of the statute, nor did she allege in any fashion that the indictment was insufficient to put her on notice of what charge to defend. After the state rested its case, however, defense counsel moved to dismiss the indictment on the ground that it was "far too broad and general." The trial court declined to do so, finding the indictment clear but the statute somewhat ambiguous.

■ For the most part the indictment tracks the language of TCA § 39–3–1404(a)(1). It alleges that defendant Joyner "did unlawfully, feloniously, knowingly and willfully access the computer system of Memphis Light, Gas and Water Division, an entity owned by the City of Memphis, Tennessee, for the purpose of executing a scheme to defraud the said Memphis Light, Gas and Water Division ..." The trial court ruled that the indictment stated an offense by alleging a felonious scheme to defraud by means of computer access, in the language of subsection (a)(1), and noted that if the defendant had needed more specific information to prepare her defense, she could have filed a pretrial motion for a bill of particulars, but had not done so.[2] We agree with this ruling. A criminal defendant who has failed to avail himself or herself of the self-help measure available under Rule 7(c) of the Rules of Criminal Procedure cannot

---

**1.** Subsections (b) and (c), not in issue here, prohibit tampering with or destroying computers and computer components, and aiding and abetting in fraud, tampering or destruction.

**2.** The prosecutor informed the court, and defense counsel conceded, that such a motion had not been necessary because the state had voluntarily provided full disclosure of the prosecution's case. Technically, of course, the two procedures have different purposes. The bill of particulars is meant to require the state to be more specific about the charge contained in the

indictment, in order to permit adequate preparation of a defense. *See generally* Rule 7(c), Tennessee Rules of Criminal Procedure. The purpose of the disclosure rules is, obviously, to permit limited discovery of the evidence that the state plans to introduce in order to prove the allegations contained in the indictment. *See generally* Rule 16, *id.* While the end result may be the same in many cases, the law governing the scope of information available under the two rules is distinctly different.

later complain that the allegations in the indictment were too non-specific to permit preparation of a defense.

■ The indictment in this case not only sets out the charge in the language of the statute, but also alleges that the defendant acted "feloniously." In other contexts, the courts have held that this terminology embraces criminal intent. *See, e.g., Young v. State*, 487 S.W.2d 305, 307 (Tenn.1972); *Harrell v. State*, 593 S.W.2d 664, 671 (Tenn.Crim.App.1979), holding that the term "feloniously," used in connection with a charge or robbery, imputes to the defendant the intent permanently to deprive the rightful owner or possessor of the goods taken by force or violence. Similarly, we believe the use of the term "feloniously" imputes to the defendant in this case the intent to defraud by "obtaining money, property, or services for [herself] or another by means of false or fraudulent pretenses," as subsection (a)(2) provides and as the trial court ruled.

We thus conclude that the indictment was not facially deficient and that, in any event, the defendant's challenge to its sufficiency, in the absence of a timely pretrial motion to dismiss or a request for a bill of particulars, came too late to provide grounds for dismissal.

■ Nor do we find any merit to the belated contention that the statute is unconstitutional because it is "vague and overbroad." As the trial judge noted, § 39–3–1404(a) is somewhat ambiguous in its language because of the supposedly disjunctive provisions in subsection (a)(1) and (2). But when these two clauses are read together, as the trial judge read them, the statute is sufficiently clear and specific in its definition of the offense to pass constitutional muster.

The courts are charged with upholding the constitutionality of statutes where possible. *Dykes v. Hamilton County*, 183 Tenn. 71, 191 S.W.2d 155, 159 (1945). This principle undoubtedly applies to provisions which are inartfully drawn, but which with reasonably unstrained interpretation can be seen to express the clear intent of the legislature. We thus decline to invalidate the provision in § 39–3–1404(a) as unconstitutional.

## II. *Sufficiency of the Evidence*

At the time of her arrest, defendant Joyner was a 13–year employee of the Memphis Light, Gas & Water Division. An investigation by MLG & W implicated her in large monetary losses, for which the utility eventually recovered $35,000 from its insurance carrier.

Intimate knowledge of MLG & W's billing practices apparently allowed the defendant to skim off large sums of cash that she received in her position as a "credit counselor" at the utility. Customers who were having difficulty paying their bills could seek assistance from MLG & W's credit counselors, who helped them develop payment plans. Partial payments would often be made on the day such plans were set up, in order to ensure uninterrupted continuation of utility services to the delinquent customer. The adjusted payments were entered on duplicate copies of the original bills. If payments were not made (or if an address became "vacant") for as long as two and one half months, the delinquent account was charged off as "bad debts."

■ Without detailing the extensive proof in the case, we can best summarize the scheme executed by the defendant as follows: As a "credit counselor," Joyner would use the MLG & W computer to call up a customer's account and print out a duplicate bill. She would then accept cash from the customer, making an adjustment on the duplicate bill. She apparently kept the cash and forged unpersonalized counter checks to turn in to the cashier as payment on several duplicate bills at a time.

Joyner would also use the computer to obtain account numbers from "bad debt" accounts, or to locate a vacant address or a delinquent account that would soon be written off by the utility as a "bad debt." She would then enter the number of one or more of these "bad debt" accounts on one of the forged counter checks. When the check was returned by the bank (usually

because it did not carry a correct bank account number), it would then be "charged back" against the largest unpaid account listed on the check, usually a "bad debt" account, and the remainder of the listed accounts would be carried on the MLG & W books as paid up. The "bad debt" accounts were usually written off by MLG & W without further investigation.

Another questionable MLG & W billing policy that aided the defendant's scheme allowed the reopening of an account at the address of a "bad debt" account if the name of the "new" customer was different from that of the delinquent customer. Under these circumstances, the new account could be opened without payment of the delinquent account, which, after passage of a few weeks, would evolve into a "bad debt" and disappear unpaid into the nether world of the MLG & W computer system.

Although the state introduced a total of 12 of these forged counter checks at trial, we need not detail the proof with regard to all 12 checks in order to demonstrate the legal sufficiency of the evidence against the defendant. An example or two will suffice.

The investigation that first brought the defendant's activities to light concerned a business account for Gilliand Easels, Inc., owned by a James Gilliand and located at 832 Mississippi Avenue. The account had changed names seven times in two years, resulting in total "bad debts" of $8,500 at the same address. Gilliand, who testified at trial, knew the defendant personally, first from doing business with her at MLG & W, and later from socializing with her. He testified that he always paid his utility bills in cash, frequently to Joyner, whom he described as "very helpful." As it turned out, the account for Gilliand's residence had also amassed "bad debts," after the names on that account had been changed repeatedly over a five or six-year period. According to James Gilliand, one of the "new" names on his residential account was that of his nephew, Terry Gilliand. By coincidence, a partially blank counter check purportedly signed by "Terry *Gilland*" and bearing the MLG & W account number

assigned to James Gilliand's residence was found in the defendant's purse at the time of her arrest. It carried no date, no bank account number, no payee's name, and no amount to be paid. Attached to it were several MLG & W duplicate bills. An investigation showed that the defendant had requested information on the Terry Gilliand account from the computer's "bad debt" file, as well as information from other accounts that appeared on several returned counter checks. No one other than the defendant had accessed the computer to inquire about the accounts in question.

Also in the defendant's purse at the time of her arrest, police found an envelope with a list of businesses and corresponding dollar figures written on the outside. These figures apparently represent amounts Ms. Joyner intended to pay to creditors and others (Zales—$400; Master Card—$500; Associates—$298; Dreifus—$600; etc.). Inside the envelope were eight duplicate bill receipts made out to various MLG & W customers and three money order receipts made out to Rita G. Joyner, two of them to a mortgage company. Also in her purse, there was a collection of four other duplicate utility bills bearing the names of various customers.

In the wastebasket by defendant's desk, police found a slip of paper on which there was inscribed a column of figures, with the words "car" and "coat" written next to two of the figures. The total at the bottom of the column was $7,468.88. This same amount appears on a counter check, purportedly signed by a Robert T. Jones, that was returned to MLG & W by the bank. Investigation by a MLG & W security agent disclosed that the Robert T. Jones account was listed to an address at which there was a boarded-up house without a working electric meter. But for the intervention of the security agent, the Jones counter check would have been charged back against a fictitious account, registered to a non-existent person, and less than three months later it would have been written off as a "bad debt." Some six months after that, all evidence of the account would have been deleted from the computer.

Armed with a search warrant, police officers searched the defendant's home shortly after her arrest. They found a large number of documents related to MLG & W and to various bank accounts. The documents were located in different parts of the house, some "in open view" and others "concealed in drawers, under the bed, in suitcases."

Pitted against this array of incriminating evidence, we have the defendant's argument that the proof was insufficient because it showed only that MLG & W's "system of paying delinquent bills was filled with loopholes that customers knew about and took advantage of," and because the state did not prove that the defendant had "signed any of the twelve checks presented at trial." We only state the obvious by pointing out that neither the utility's admittedly poor collection procedures nor the complicity of some customers is sufficient to relieve the defendant of criminal liability in this case. Moreover, there was no burden on the state to show that Joyner had signed the checks used as part of her fraudulent scheme, but only that she used MLG & W's computer system to put that scheme into effect. We conclude that the evidence, only a portion of which is summarized here, amply supports the verdict.

### III. *Sufficiency of the Jury Charge*

Finally, the defendant alleges that the trial judge's instruction to the jury defining the offense of computer fraud was erroneous. The trial judge told the jury that one who "knowingly and willfully, directly or indirectly, accesses, causes to be accessed, or attempts to access any computer software, computer program, data, computer, computer system, computer network, or any part thereof, for the purpose of devising or executing any scheme or artifice to defraud another is guilty of a felony." After setting out the separate elements of the offense and defining terms such as "access," "computer system," "data" and the like, the judge told the jury that "[p]ertinent to this offense, 'fraud' or 'to defraud' means the obtaining or relinquishing of a right or goods, property or

services by false pretense, scheme or artifice." In so doing, the trial judge incorporated both clauses in TCA § 39-3-1404(a)(1) and (2) into the definition of the offense, in order to clarify what he correctly perceived to be an ambiguity in the statutory provision as drafted. Given our discussion in Section I, above, we find no error in this portion of the instruction.

The judgment of the trial judge is affirmed.

DUNCAN and JONES, JJ., concur.

