IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

AUGUST 1997 SESSION

FILED

February 27, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. No. 03C01-9702-CC-00047 |
| | * | |
| Appellee, | * | BLEDSOE COUNTY |
| | * | |
| VS. | * | Hon. Thomas W. Graham, Judge |
| | * | |
| JOHN C. GARRISON, | * | (Solicitation to Commit First Degree |
| | * | Murder) |
| Appellant. | * | |

For Appellant:

Gregory P. Isaacs
280 One Centre Square
P.O. Box 2448
Knoxville, TN 37901-2448
(on appeal)

Thomas N. DePersio
136 S. Illinois Avenue
Suite 104
Oak Ridge, TN 37830
(at trial)

For Appellee:

John Knox Walkup
Attorney General and Reporter

Michael J. Fahey, II
Assistant Attorney General
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

James W. Pope
Assistant District Attorney General
First American Bank Building
Dayton, TN 37321

OPINION FILED:_____

REVERSED AND REMANDED

GARY R. WADE, JUDGE

## OPINION

The defendant, John C. Garrison, was convicted of solicitation to commit first degree murder, a Class B felony. The trial court imposed a Range II sentence of sixteen years to be served consecutively to a sentence in Knox County for two counts of theft over ten thousand dollars. The defendant was fined twenty-five thousand dollars.

In this appeal of right, the defendant presents the following issues for our review:

> (I) whether the evidence was sufficient to sustain a conviction for solicitation to commit first degree murder;
>
> (II) whether the defendant was denied the effective assistance of counsel under the state and federal constitutions;
>
> (III) whether the defendant was denied the effective assistance of counsel because of the failure to communicate a plea offer;
>
> (IV) whether the solicitation statute, on its face and as applied by the trial court, is unconstitutionally vague and overbroad; and
>
> (V) whether the trial court improperly charged the jury that the defendant was eligible to receive a sentence of 12 to 20 years as a multiple, Range II offender.

Because we have determined there to be prejudicial error, we must reverse the judgment and remand this cause to the trial court for further proceedings in accordance with this opinion.

The state charged that the defendant, while in prison on prior theft convictions, had attempted to arrange the death of Charles Coward, a victim of his prior crimes. On the morning of trial, May 15, 1995, original defense counsel, Thomas N. DePersio, asked for a continuance because he had just four days earlier

2

obtained evidence of taped conversations between the defendant and two state witnesses. According to DePersio, the transcripts were critical in determining whether the defendant should testify. DePersio argued that he could not competently represent the defendant because the evidence was so belatedly provided. In response, the state insisted that DePersio had been notified of the existence of the evidence as early as December of 1994. The trial court denied the continuance request.

At trial, Jeff Blevins, an Assistant District Attorney for Knox County, testified that prior to this trial, in August of 1992, he had prosecuted the defendant on two charges of theft. In one of the theft cases, the victims were Charles Coward and Loy Smith, partners of Holston View Farms. The defendant had pled guilty to the charge. As part of the plea agreement, the defendant was to pay fifteen thousand dollars in restitution on the day of the plea. At a subsequent hearing, the defendant was supposed to submit a plan for restitution and receive probation. Blevins recalled that no plan was ever provided; therefore, the defendant received an eight-year prison sentence and was ordered to pay forty-one thousand dollars in restitution. According to Blevins, Coward would have been the state's most essential witness had the case gone to trial.

On cross-examination, Blevins conceded the defendant had provided a proposed plan to pay the balance of the restitution, but the state had nonetheless opposed a sentence of probation. The state rejected offers of two-hundred fifty dollars and five hundred dollars per month and then sought the maximum sentence without probation on the premise that the defendant had failed to provide a plan of

restitution.[1]  The trial court denied probation and the defendant was sentenced to prison.

Coward, the sixty-four-year-old victim of the solicitation, testified that he and Loy Smith were partners in a several businesses.  They co-own and operate Vend-A-Wash, a coin laundry business in Knoxville; their general business office is located in a two-story building on Holston Drive and the main laundry site is next door.  In the early 1990's, the office safe was protected by a local rather than a monitored alarm system.  Coward recalled that his custom was to go to nearby Ruby's Coffee Shop every morning just after 5:00 a.m.; he then traveled by car to his office, arriving there between 5:44 a.m. and 6:00 a.m.  Coward testified that he carried the business proceeds in the trunk of his car and armed himself with a loaded .38 Chief Special.  Generally, no one else arrived at the office until well after 7:00 a.m.

In the summer of 1990, Coward and Smith formed Holston View Farms, Inc., for the purpose of acquiring land options.  The defendant was hired to acquire those options.  The relationship ended about nine months later when Coward learned that the defendant had stolen a large sum of money.  Coward and Smith hired attorney Herb Moncier to prosecute the defendant for theft, attended each of the hearings, planned to testify had the case gone to trial, and were adamantly opposed to the defendant receiving probation.  Coward recalled that defense attorney DePersio had offered a restitution in the sum of fifteen thousand dollars, paid upon entry of the defendant's guilty plea plus five hundred dollars per month.  Coward and Smith received twelve thousand dollars from the initial

---

[1]The Court of Criminal Appeals subsequently held that the state had reneged on the plea agreement and remanded for sentencing.  On remand, the defendant received two consecutive nine-year sentences as a Range II multiple offender.

4

payment. Three thousand dollars was divided by two victims of a different theft committed by the defendant. Coward remembered that both of those victims were also prepared to testify against the defendant had there not been a guilty plea to the theft charges.

John Rollyson, a prison inmate serving a seventeen-year sentence for conspiracy to commit first degree murder, testified that in 1993 he informed Charlie Scott of the Tennessee Bureau of Investigation that the defendant had asked him to have an unnamed person killed. Another TBI agent contacted Rollyson with a plan to audiotape a discussion with the defendant.

In their taped discussion, the defendant provided Rollyson with details about the victim but did not reveal his motive for the killing; without naming the victim, he described him as a heavy man who went to work at a coin laundry business in Knoxville at a certain time every morning and stopped along the way to eat breakfast at the same restaurant. The defendant said that the victim drove a large older model car, carried a lot of money in his trunk, and kept a gun under the front seat. He suggested that the victim would be alone in the office during the early morning hours. The victim was to be robbed and killed, with the robbery proceeds to be kept by the killer; if the proceeds fell short of ten thousand dollars, the defendant agreed to pay the difference. The defendant told Rollyson that there was a safe in the office and little security.

After delivering the tape to prison officials, Rollyson agreed to set up a meeting between the defendant and his uncle's girlfriend Joanne Kurth, who was to communicate the plan to Rollyson's uncle. The uncle would perform the killing.

5

At trial, Rollyson testified that he suspected that the defendant was trying to set a trap because the plan included a killing very similar to the one for which Rollyson had been convicted. See State v. Gaylor, 862 S.W.2d 546 (Tenn. Crim. App. 1992); State v. Hutchison, 898 S.W.2d 161 (Tenn. 1994). Rollyson acknowledged that he had pled guilty and testified for the state against his co-defendant in the trial of his earlier crime. He also admitted that he had directed the defendant to fill out a visitation form for the Joanne Kurth meeting scheduled in September of 1993.

Joanne Schuller, a special undercover TBI agent, testified that she visited the defendant in September of 1993 posing as Joanne Kurth. The purpose of the visit was to arrange a murder contract. The agent, who recorded the conversation, told the defendant that Rollyson had telephoned her. She acknowledged that she was aware of the defendant's problem and his need for a solution. In response, the defendant recited a hypothetical situation about a prisoner who faced an important trial which could result in an acquittal if there were no witnesses to testify against him. The defendant then described the victim, initially without naming him, as one who owned coin laundry businesses in Knoxville, with daily business proceeds of up to ten thousand dollars. He pointed out that the victim would be alone during certain hours of the day and would have the cash in the trunk of his car. The defendant told Agent Schuller that he would guarantee any difference between the amount robbed from the victim and ten thousand dollars. When the agent asked if they were moving from hypothetical to fact, the defendant nodded in the affirmative but made no verbal response. Agent Schuller agreed to a ten thousand dollar fee for the crime with a five hundred dollar advance payment. The defendant committed to pay any shortage from the robbery through Rollyson

6

and then identified the intended victim as Charlie Coward of Vend-A-Wash in Knoxville.

Agent Schuller testified that she was aware that Agent Tom Carmouche, posing as a hit man named Tom Ross, had already spoken with the defendant at the prison. She did not know that the defendant had contacted Agent Jenkins about Ross' visit. Agent Schuller described the five hundred dollar advance as "good faith money" to be paid before the killing. She acknowledged that the defendant never made the initial payment.

When defense counsel moved for an acquittal at the conclusion of the state's proof, the trial court initially granted the motion as to the solicitation charge because there was nothing to show that the contract was complete. Initially, the trial judge ruled that the evidence was adequate to show that the defendant had attempted to solicit the murder of Coward, but pointed out that the indictment alleged a solicitation. After lengthy discussions, the court changed its ruling, holding that the state's proof would sustain the offense of solicitation to commit first degree murder.

The defendant's father, David M. Garrison, testified that his son had experienced financial difficulties for years. He acknowledged that he had paid the fifteen thousand dollars in restitution for his son's Knox County thefts. He testified that his son had not requested five hundred additional dollars which might have been utilized as the advanced payment.

In his trial testimony, the defendant confirmed his history of money troubles and confessed to his prior convictions for passing bad checks, which

7

included one felony and several misdemeanors. He admitted that he had pled guilty to two counts of theft for which he initially received consecutive sentences of eight and six years, later modified to concurrent terms. The defendant, who was serving that sentence at the time of this charge, appealed on the ground that assistant district attorney Blevins had breached the plea agreement by opposing probation. A panel of this court sustained his argument and awarded a new sentencing hearing.[2] The defendant acknowledged his displeasure about the district attorney's office and revealed that he often talked about his anger to other inmates.

The defendant testified that he spoke about his situation with Jerry Johns, an inmate who worked in the prison library. Johns, he said, suggested that his best alternative was a new trial and the absence of critical state witnesses. While Johns' suggestion surprised and scared the defendant, he did not discontinue the conversation with Johns until he learned that Johns had a relative who could be hired to kill. While conceding that he went along, the defendant claimed he never encouraged Johns to set up a meeting. He insisted that other inmates, including Rollyson, made similar suggestions. The defendant asserted that he "played along" by continually expressing dissatisfaction with Coward and those involved in his prosecution.

The defendant recalled a visit from undercover TBI Agent Tom Carmouche, who introduced himself as Tom Ross and who described himself as a hitman. The defendant claimed that he rejected the offer made by "Ross" who, he claimed, threatened him with harm if he repeated the content of their conversation. The defendant testified that he informed a guard that his visitor had offered to kill

_____

[2]An appeal of that sentence is now under review by a separate panel of this court. State v. Garrison, C.C.A. No. 03C01-9601-CR-00050 (Tenn. Crim. App., at Knoxville, app. pending).

someone for money. He recalled that the guard thought he was joking. The defendant testified that he returned to his cell block and telephoned an attorney, Steve Irving of Knoxville, to inform him of the incident. The defendant claimed that he also reported the incident to Lt. Terry Bedwell, a shift officer at the prison. Bedwell arranged a meeting with Internal Affairs Officer Greg DeLong, who told the defendant that TBI Agent Jack Jenkins wanted to interview him.

The defendant testified that he gave a statement to Agent Jenkins, who asked that he try to get Ross to return to the prison. A few days later, the defendant informed Lawrence Towe, a Knoxville businessman, about the conversations.

The defendant recalled that Rollyson had informed him of his prior involvement in a contract killing, a fact he already knew. He stated that he knew that Rollyson had testified for the state and that Rollyson's co-defendants had received either death sentences or life terms as a result. The defendant expressed his belief that Rollyson was attempting to extract money; he testified that he did not think Rollyson's offer was serious. While Rollyson provided him with instructions on where to send the five hundred dollars, the defendant confirmed that he did not send the money.

The defendant acknowledged his meeting with Joanne Kurth in September of 1993. Following their conversation, he informed Officer Baker and Officer Michael Holder about her visit and the discussion of contract killing. He testified that he believed Kurth was trying to scam him for five hundred dollars and claimed that he never asked his father to provide the advance necessary. The defendant recalled a separate meeting with Agent Jenkins and Officer DeLong. He

9

told Agent Jenkins that he had had another possible contact but he did not specifically mention Joanne Kurth's name.  The defendant insisted that he did not intend any harm to Coward, Smith, Blevins, Moncier or either of his other two theft victims.

On cross-examination, the defendant did not deny making the statements to Rollyson about Coward and his work habits.  He admitted that he was not working for the TBI on August 26, 1993, when this taped conversation with Rollyson took place and that he did not specifically inform Agent Jenkins about Rollyson.  While acknowledging that he spoke with Johns about killing Coward, Smith, and others, he insisted that Johns had approached him with the proposal and, as a result of their conversation, "Tom Ross" had made his visit.  The defendant claimed that he told Agent Jenkins that there were several individuals offering to perform the killings and explained that he did not specifically name Rollyson or Kurth.

Officer Michael Holder, testifying as a defense witness, recalled a conversation with the defendant on or about September 22 or 23, 1993.  They discussed an event that occurred the previous Sunday in which the defendant purportedly had a visitor who had offered to "make people disappear."  Officer Holder did not see the visitor.

Lawrence Towe, a friend of the defendant, testified that the defendant told him that he thought he was being set up because someone had approached him about a killing.  Towe recalled that he did not believe at the time that there was any substance to the defendant's concern.

10

Thomas Marshall, who was serving a seventeen-year sentence for aggravated rape at the time of these events, testified that he knew that several inmates, including Rollyson and Johns, were trying to set up the defendant in an effort to scam his money. He remembered that while there was talk of contract killing, the defendant was not taking it seriously.

John Baker, the unit officer for the cell block, recalled that the defendant asked to see internal affairs about a visit he had from a stranger. A week or two later, when Officer Baker inquired whether the visitor had returned, the defendant first replied in the affirmative, and then said, "No, it was a woman this time." He recalled the defendant saying the woman offered to make a hit. Officer Baker testified that he did not believe the defendant and did not report the conversation to anyone.

On redirect by the state, Agent Jenkins testified that the defendant was not working as a TBI informant, although he seemed to believe that he was. Agent Jenkins testified that before the arrest, the defendant made no mention of Joanne Kurth or anyone else other than Johns and that Johns and Rollyson were both working for TBI at the time. He stated that he had visited twice with the defendant to keep up the "ruse" and to give the defendant an opportunity to renounce the solicitation. Agent Jenkins acknowledged that Johns volunteered to work for the TBI and wanted something in return. He conceded that Rollyson also volunteered to act on behalf of the TBI. He testified that when the defendant offered to help the TBI, he had at first tried to dissuade him. When he was unable to do so, Jenkins testified that he acted as if he accepted the defendant's help.

I

The defendant first challenges the sufficiency of the evidence. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as triers of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

At the time of the offense, the crime of solicitation was defined as follows:

> (a) Whoever, by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense ... with the intent that the criminal offense be committed, is guilty of the offense of solicitation.

Tenn. Code Ann. § 39-12-102. In State v. Lee, 618 S.W.2d 320, 324 (Tenn. Crim. App. 1981), this court determined that the elements of solicitation consist of (1) the intent that a criminal offense be committed; and (2) a "willful communication of ... that intent to another in the form of a solicitation, request, command or hiring." The Sentencing Commission Comments provide that the "defendant must intentionally try to enlist another in criminal activity and must intend that the offense be committed." The legislative intent is to punish those who instigate group criminal activity.

12

Here, of course, the defendant was charged with solicitation of first degree murder. At the time of this offense, first degree murder was defined as "[a]n intentional, premeditated and deliberate killing of another...." Tenn. Code Ann. § 39-13-202(a) (Supp. 1993). "Intentional" is the culpable mental state which "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). Premeditation is a previously formed design or intent to kill. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). Deliberation was defined at the time as cool purpose, when a killing is other than one made in a momentary state of passion. Id.

In our view, the state's evidence, accredited by the jury, is sufficient to support solicitation to commit intentional, premeditated and deliberate killing. Taken in a light most favorable to the state, the taped conversation between Agent Schuller and the defendant established an intentional communication in the form of a request to commit the murder of the victim Coward. The state's proof indicated the defendant's previously formed design to kill, an intent to cause the death of the victim, and the defendant's cool purpose. By accrediting that evidence, a rational jury could have found the defendant guilty beyond a reasonable doubt.

II

At his motion for new trial, the defendant contended that his trial counsel was ineffective because he conducted "virtually no investigation," failed to pursue discovery from the state, failed to file notice of an affirmative defense, failed to maintain communication with the defendant, failed to review the state's evidence with the defendant prior to trial, failed to interview witnesses, failed to keep scheduled appointments, and was generally unprepared to proceed on the day of

13

trial.  The defendant argues that these shortcomings, partly attributable to trial counsel's struggle with alcohol[3] and depression, deprived the defendant of his right to effective counsel under the Fifth and Sixth Amendments of the United States Constitution and Article I, section 9 of the Tennessee Constitution.  The defendant argues trial counsel's representation fell below the standards set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and the ABA Standards of Criminal Justice. The state asserts that the performance of trial counsel was not deficient and even if it was, that the defendant has failed to show prejudice.

Represented by new counsel at the hearing on the motion for new trial, the defendant offered proof of his trial counsel's ineffectiveness through letters, the transcript of the motion to continue the trial, and the testimony of his trial counsel. While the defendant did not testify at the hearing, he submitted an affidavit in support of his motion for new trial.  The affidavit was not included in this record.

A lawyer in trial counsel's firm wrote a letter to the defendant one month before trial which began:

> Dear Mr. Garrison:
> I am sorry to have to be writing this letter to you; I really thought Mr. DePersio would be able to handle your case in Bledsoe County.
> He was out of the office for about a month suffering from depression and returned several weeks ago and seemed to be doing well.  Last week he suffered another bout of depression and is out of the office again. For this reason, I would recommend that you obtain other counsel for the Bledsoe case. If you will notify us of your new counsel, we will send the pertinent portions of Tom's file....

The defendant responded as follows:

---

[3]There is no evidence in the record to indicate that trial counsel was intoxicated during the trial.

...You and [] have been my only sources of information and unfortunately you have been hindered by Tom's lack of action. I appreciate your help. While I wish Tom only the best, I am certainly disappointed that he has become so ineffective. ... Nor am I happy to find that the lawyer upon whom I have relied for representation is suddenly mentally incapacitated some thirty (30) days prior to trial....

DePersio remained as trial counsel and argued for a continuance on the morning of trial:

Mr. DePersio: Now then, I very promptly and very early on in the case filed a motion ... a request for discovery ... and I signed it on November 9, of 1993 .... In response to that, I was provided a copy of a transcript of a conversation between [the defendant] and an undercover TBI agent by the name of Schuller, who was going under the name of Kurth, or something to that effect, and that was all that I was provided.

... I had assumed, and it turns out correctly, that there had been a number of recorded conversations, not only involving [the defendant], but involving other inmates with the TBI agent.

Now, those conversations, the two other inmates are ... Jerry Johns and ... John Rollyson ....

... [t]he 5th of May, [1995,] I had a conversation with [District Attorney General] Pope, ... he advised me that Mr. Jenkins had finally provided the information and that ... I could come down ... to review the information. ... It turns out Thursday I had a jury trial. So May 10 was when was available. ... [I] met with Mr. Pope ... and reviewed the information.

Now, there were a number of cassette tapes, six to eight tapes, and admittedly, I listened to one and said, you know, I'm not going to listen to the others, to see if they would be consistent with the transcriptions, and I don't know if that's the same manila envelope I looked at, but on the outside of the envelope that had the tapes, had highlighted in red which tapes were transcribed. None of the highlights, as I recall, included any conversations other than the Schuller conversation, which I already had, that involved [the defendant]....

So I scanned the stuff coming back in the car from Dayton, but really did not have a great deal of time, because I had the jury trial Thursday ... on Friday the 12th [of May, 1995,] ... was when I first realized that there were two significant recorded and transcribed conversations involving [the defendant] and the inmates ... Johns ... and ... Rollyson.

15

... [T]he conversations of [the defendant] were vitally important, and I should have had those a real long time ago.

Now, what it comes down to then is Friday, our strategy basically has changed somewhat in that now we're confronted with this information, and we have to deal with it somehow or another. Now, I had made arrangements to visit with [the defendant] on Saturday, but I was unable to do that as a result of my office schedule. And then I did go down later yesterday afternoon, but it was Mother's Day and it was also my son's birthday. By the time I was able to get there, I only had enough time to leave the statements with the prison authorities to deliver to [the defendant] for him to have the opportunity to review just last night. So he and I haven't even discussed them....

... You know, I don't see that he could ... be competently represented, this information just coming to me in such a short time prior to trial, or that he could be effectively represented, not having the ability to prepare regarding those statements.

***

General Pope: ... I believe back in December of '94, I gave him discovery and told him that he could come and look at my files at any time.... I said, you know, I've still got this stuff here, you're welcome to come see it, and he said, ["]Fine, I'll come see it in January,["] and Mr. DePersio didn't come in January. And then I contacted him before this trial again [to ask] if he was going to come see it and he said yes, and that's when he came....

Trial counsel admitted being asked by the defendant whether he was prepared to try the case. While revealing that he had replied in the affirmative, trial counsel testified at the hearing on the motion for new trial that he had not fulfilled his personal standards for representation. The following exchange occurred at the hearing:

The Court: ... [Y]ou know how much time you spent on this case .... I want to know ... do you believe, looking back on your mental condition leading up to this trial and way that the trial ultimately got to the point of being handled ... looking at the preparation, do you think ... you provided within a reasonable degree of professional care, that you held up to your duty ... to prepare an adequate defense?
Trial Counsel: ... I believe [my] efforts ... met that requirement, but ... it was not something that I was particularly pleased with as far as, you know, myself....

16

> The Court: So you'll admit ... you don't think you met your own [personal] standards in this case?
> Trial Counsel: No, I don't.

Trial counsel also testified that he had practiced law for eighteen years and had conducted more than one hundred fifty jury trials on charges ranging from misdemeanors to murder. He had previously represented the defendant for the Knox County thefts. He recalled that for this solicitation charge, he had first contacted the defendant after he was indicted by the grand jury in mid-October of 1993 and, during the twenty months until trial, had met with the defendant on only four occasions for no more than six hours. He acknowledged scheduling but failing to attend sixteen or more other appointments with the defendant, explaining that he did not feel like traveling or he did not feel like a meeting. Trial counsel conceded that he was suffering from depression and alcohol problems and, in the months prior to trial, had been arrested for DUI and had lost his driving privileges. Trial counsel kept no time records and had no idea how much time he had spent on this case.

Trial counsel testified that the defendant was genuinely concerned about whether there had been an adequate investigation. He acknowledged that in April of 1995 he saw a psychiatrist, received a prescription, and was using an anti-depressant during the defendant's trial.

Trial counsel remembered that most of his preparation occurred between May 10 and May 15, 1995. He described his strategy at trial as an attempt to convince the jury that the defendant was simply "playing along" with the killing for hire scheme. He testified that he did not intend to put on evidence of entrapment or renunciation of the solicitation because he did not think there was evidence of either; he did, however, concede that he requested an instruction on renunciation to

17

"cover bases." Trial counsel explained, "I didn't see entrapment as working, because [the defendant] is the one offering the money.... Renunciation seemed senseless, because there was no proof of that."

Trial counsel stated that he was satisfied with the number and content of his meetings with the defendant. He could not recall any favorable witnesses that he failed to utilize and did not think it essential to discuss the content of the tapes of conversations with the defendant prior to trial even though the defendant would likely have to explain the contents if he chose to testify at trial. Trial counsel acknowledged that he had an opportunity to review these statements with the defendant between the first and second days of the trial but did not.

Trial counsel remembered that he asked for a continuance on the morning of trial but he could not recall why:

> You know, I discuss in there that my strategy has changed and I don't know if that was, I can't honestly say whether or not that's kind of huffing sort of like a used car salesman.... [The defendant] asked me if I was ready to go to trial and ... I sensed some discomfort...."

He revealed that he was provided with transcripts on May 10, 1995, five days before the trial, and that he left them at the prison for the defendant on the night before trial. During argument for a continuance, trial counsel had said, "I haven't even discussed [the transcripts] with him. ... [H]e and I haven't discussed it at all."

At the evidentiary hearing, trial counsel described his statement in support of the continuance as "huffing, something that is neither honest nor dishonest.... [I]t seemed like a reasonable explanation to approach the Court ... saying, look we just got this information.... [I]f there was a strategy change it would have been a slight strategy change, but a strategy change nonetheless...." Of the

18

tapes and transcripts, trial counsel stated, "they were not significant. They were significant in the context of the requests for a continuance, so yes, they were significant, but as it related to the trial of the matter itself on the merits, they were not significant in the way I looked at the case. I might have looked at the case wrong." Trial counsel admitted that he never reviewed the original tape recordings in their entirety to verify the authenticity of the transcripts.

Trial counsel testified that he was unaware that the defendant had unsuccessfully attempted to make contact by telephoning his office on fifty-nine occasions in October of 1993. He acknowledged that he did not spend a significant amount of time counseling the defendant during the trial. While asserting that the defendant never sought his withdrawal as counsel, trial counsel concluded that the defendant did inquire as to his readiness for trial. Trial counsel testified that he never had any reason to question or investigate the defendant's mental stability or competency. He acknowledged that he still took an anti-depressant drug and continued to practice law.

The trial court denied the defendant's motion for a new trial holding in part as follows:

> This Court finds the representation of Thomas DePersio, while not meeting the highest standards with regard to pre-trial communication and preparation, did not deny the Defendant a fair trial and that there was full airing of the relevant facts and a full confrontation with State witnesses, upon which the jury in this case could and did make a fair and impartial decision.... [I]t is not shown that any shortcomings of counsel, while regrettable, actually resulted in a failure to present any particular witness or defense which deprived this Defendant of a fair trial.

In order to establish that his counsel was ineffective, the defendant must show that the advice given or services rendered were not within the range of

competence of attorneys in criminal cases.  Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975).  He must also establish that but for his counsel's deficient performance, the results of the trial would have been different.  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).

The burden is on the defendant to show that the evidence preponderates against the findings of the trial judge who, in this instance, found in favor of the state.  State v. Zimmerman, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991); Clenny v. State, 576 S.W.2d 12 (Tenn. Crim. App. 1978).   The findings in the trial court on questions of fact may not be reversed on appeal unless the evidence preponderates otherwise.  Zimmerman, 823 S.W.2d at 224; Graves v. State, 512 S.W.2d 603 (Tenn. Crim. App. 1973).

In Strickland, the court described the burden of proof as follows:

First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or ... sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S. Ct. at 2064.

To establish prejudice, the evidence stemming from failure to prepare a sound defense or present witnesses must be significant, but it does not necessarily follow that the trial should have otherwise resulted in an acquittal. Id. at 2071; see Nealy v. Cabana, 764 F.2d 1173 (5th Cir. 1985); Code v. Montgomery,

20

799 F.2d 1481 (11th Cir. 1986). In Hellard v. State, 629 S.W.2d 4 (Tenn. 1982), our

supreme court made the following pronouncements:

> Although ... we adopted a higher standard of competence for the legal representation required in criminal cases, we did not require perfect representation. Moreover, the defense attorney's representation, when questioned, is not to be measured by "20-20 hindsight."
>
> ***
>
> It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics.... [W]e know that a criminal trial is a very dramatic, vibrant and tense contest involving many variables and that counsel must make quick and difficult decisions respecting strategy and tactics which appear proper at the time but which, later, may appear to others, or even to the trial lawyer himself, to have been ill-considered.

Id. at 9-10. In Hellard, our supreme court adopted the rationale of United States v.

DeCoster, 487 F.2d 1197, 1201 (D.C.Cir. 1973):

> This court does not sit to second guess strategic and tactical choices made by trial counsel. However, when counsel's choices are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel.

The Standards for Criminal Justice describe the duty to investigate as follows:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities....

ABA Standards for Criminal Justice, 4-4.1(a) (3d ed. 1993). Comments to this

section provide as follows:

> Facts form the basis of effective representation. Effective representation consists of much more than the advocate's courtroom function per se. Indeed, adequate investigation may avert the need for courtroom confrontation. Considerable ingenuity may be required to locate [witnesses] .... The resources of scientific laboratories may be required .... Neglect of any of these steps may preclude the presentation of an effective defense.

> The prosecutor and law enforcement agencies are important sources of information often needed by the defense lawyer.... Defense counsel should urge the prosecutor to disclose facts even though defense counsel must then proceed to verify them.
>
> ***
>
> Effective investigation by the lawyer has an important bearing on competent representation at trial, for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial .... The effectiveness of advocacy is not to be measured solely by what the lawyer does at the trial; without careful preparation, the lawyer cannot fulfill the advocate's role....

Commentary, ABA Standards for Criminal Justice 4-4.1 (emphasis added).

In our view, the performance of trial counsel was deficient by his failure to adequately investigate portions of the proof and maintain communication with his client. The kind and quality of representation afforded the defendant prior to trial do no honor to the bench, the bar, or the criminal justice system. Thus, the question becomes whether the defendant was prejudiced by these deficiencies:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.

There must be a reasonable probability that but for counsel's unprofessional error, "the result of the proceeding would have been different," not that it necessarily would have been different. Id. at 693, 104 S. Ct. at 2068. The probable result need not be an acquittal. A reasonable probability of being found

guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland. See Zimmerman, 823 S.W.2d at 225 (citing Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990)).

While trial counsel was ineffective because he performed "virtually no investigation," the defendant in our view has been unable to demonstrate how more extensive investigation of the facts would have benefitted the defense theory at trial. Certainly, the defendant has been unable to present new witnesses that would have been helpful to his defense theory. In that regard, the evidence does not preponderate against the findings of the trial judge. Moreover, the defendant has not established that knowledge of the tapes, if discovered earlier, or a more intensive review of the content would have changed the result of his trial. The defendant has not established that his trial would have been different had trial counsel promptly traveled to Dayton in December of 1994 to retrieve the evidence of taped conversations between the defendant and inmates Rollyson and Johns. Rollyson testified at trial and was subjected to a probing cross examination. Johns was not called as a witness. The tape recorded conversations at issue were never entered into evidence. Thus, the defendant was not actually prejudiced by trial counsel's lack of diligence in timely reviewing the content of the tapes or by his failure to timely and adequately prepare the defendant to testify about their content.

Trial counsel failed to file notice of affirmative defenses of entrapment or renunciation of his solicitation. Instead, his strategy was to contest the culpability of his client; he asserted that the defendant lacked the requisite mens rea for solicitation in that he did not intend for anyone to be killed and did not consummate his bargain by payment of the "advance money." At the new trial hearing, trial

23

counsel was questioned about the impact late discovery had on his defense strategy:

> Appellate counsel: Isn't it true that the Rollyson's transcript was important, because Rollyson was the first person that talked to [the defendant] and after Rollyson you had the TBI undercover agents? So evaluating an entrapment defense or assessing other avenues to proceed, Rollyson was pretty important, correct?
> Trial counsel: I didn't see an entrapment defense there.
> Appellate counsel: Well, and you testified during direct that your strategy was, we did it. Isn't it true in court that you asked the judge for a renunciation instruction?
> Trial counsel: I don't recall and I don't deny that. That sounds accurate.
> Appellate counsel: And isn't it true that you never filed a notice, that you were using affirmative defense of renunciation that's required?
> Trial counsel: I don't recall. That sounds accurate.
> Appellate counsel: Do you think if you had looked at this information a little sooner that you might have talked to [the defendant] and listened to the tapes and you may have filed a notice of renunciation instead of bringing it up during the middle of trial?
> Trial counsel: No. I don't know. I don't think so, because the renunciation, in effect, was contrary to our strategy, because how could you renounce something that you had never voluntarily entered into?

In hindsight, the entrapment defense or one of renunciation might appear to be a plausible defense theory. Yet the proof at the motion for new trial did not establish to the satisfaction of the trial judge a reasonable probability that an entrapment or renunciation defense would have changed the result of trial. There has been no offer of proof as to what facts would support an entrapment defense and the defendant's own testimony belies a claim of renunciation. Thus, despite our conclusion that trial counsel was deficient by his performance, the evidence offered at the hearing on the motion for new trial simply does not preponderate against the findings made by the trial court that no prejudice resulted.

The letter from trial counsel's law partner advising the defendant to retain other counsel is troubling. The state points out that trial counsel returned to

the office days after that letter was written and, therefore, had adequate time to prepare for trial. Trial counsel's explanation that he was merely "huffing" at the time of the continuance request because he thought the defendant was uncomfortable and wanted a delay is also of concern. The prolonged absence of trial counsel from his work due to depression or excessive alcohol use would warrant circumspection. Again, however, the defendant has been unable to establish how trial counsel's absence from his office adversely affected the results of his trial.

III

Next, the defendant argues that his trial counsel was ineffective because he failed to communicate a plea offer to the defendant prior to trial. The state contends that the defendant would not have accepted the offer anyway; thus, there was no prejudice to the defendant.

An attorney is required to promptly communicate a plea offer to a client. See State v. Rubio, 746 S.W.2d 732, 736 (Tenn. Crim. App. 1987). The ABA Standards for Criminal Justice advise attorneys to communicate plea offers promptly and fully:

> (a) Defense counsel should keep the accused advised of developments arising out of plea discussions conducted with the prosecutor.
> (b) Defense counsel should promptly communicate and explain to the accused all significant plea proposals made by the prosecutor.

ABA Standards for Criminal Justice 4-6.2. The Commentary makes the following emphasis:

> [T]he lawyer has the duty to communicate fully to the client the substance of [plea] discussions.... [T]he client should be given sufficient information to participate intelligently in the decision whether to accept or reject a plea proposal. It is important that the accused be informed both of the existence and the content of proposals made by the prosecutor; the accused, not the

lawyer, has the right to decide whether to accept or reject a prosecution proposal, even when the proposal is one that the lawyer would not approve. If the accused's choice on the question of a guilty plea is to be an informed one, the accused must act with full awareness of the alternatives, including any that arise from proposals made by the prosecutor.

Prior to trial, trial counsel had approached the District Attorney to ask if there was any possibility of a settlement. The state responded with an offer of Range I, ten years, consecutive to the Knox County sentences for theft. At the new trial hearing trial counsel testified, "We weren't inclined to accept it ... our feelings were we needed to come out clean on this for Knox County."[4] He recalled that the defendant had told him he could not enter a plea agreement and, in consequence, he never communicated the offer to the defendant prior to trial. During jury deliberations or sometime after conclusion of the trial, trial counsel informed the defendant of the plea offer; his recollection of the conversation was that the defendant said he would not have accepted the proposal but did recognize the failure in communication as a possible basis for a new trial. Trial counsel signed an affidavit containing the following assertion:

> Shortly before trial of this cause, I spoke with Assistant District Attorney Pope[] concerning a potential plea agreement in this case. Assistant District Attorney Pope communicated to me a plea offer of 10 years Range I, standard, if Mr. Garrison pled to all counts of the indictment.
> Although I met with Mr. Garrison prior to the trial of this cause, I never related to him the offer given to me by Assistant District Attorney Pope.
> Mr. Garrison never learned of the State's offer until after the trial of the matter had been concluded.

---

[4]In theory, an acquittal in this case and an enforcement of the original plea agreement in the Knox County theft cases could have resulted in probation for the defendant. See State v. Garrison, No. 03C01-9305-CR-00169 (Tenn. Crim. App., at Knoxville, Jan. 10, 1995) (reversing and remanding for resentencing), app. pending, State v. Garrison, No. 03C01-9601-CR-00050 (Tenn. Crim. App., at Knoxville, no date).

Trial counsel testified that he did not believe he had a professional duty to inform the defendant of the plea offer. He conceded, however, that clients often changed their minds on guilty pleas and acknowledged having reached an agreement through negotiation even when the first offer was unacceptable. He recalled that, in this instance, the District Attorney made it clear that this was a take it or leave it offer subject to no further negotiations. Ultimately, the defendant received a sixteen-year sentence, six years more than the state's pretrial offer.

In its denial of the motion for a new trial, the trial court made the following observations:

> With regard to the failure to communicate the State's plea offer, this Court finds that the Defendant had communicated to his attorney early on and throughout his discussions that he would not negotiate a plea. The Court would further note that this particular Defendant was quite familiar with the plea bargaining process, having entered into many pleas over the preceding decade, including four felony pleas.... It should be noted that there is no reason to believe nor proof presented that this Defendant would have accepted the ten (10) year sentence offered by the State a few days before trial. The very fact that Defendant did not even inquire about a possible plea offer until after the trial was in the hands of the jury, given this Defendant's familiarity with the system, is a telling point for this Court.

The question for this court is whether counsel's failure to communicate a plea offer prior to trial qualified as ineffective assistance even though the defendant had earlier instructed that he would not enter a plea agreement.

In Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994), the supreme court ruled that trial counsel's failure to communicate a plea bargain offer to the defendant prior to trial qualified as ineffective assistance of counsel. In that case, defense counsel representing a client charged with assault with intent to commit

27

murder received an offer from the state for a Range I sentence of five years with no probation or community corrections alternatives. Id. at 663. The defendant proceeded to trial with no knowledge of the plea offer. Id. He was tried, found guilty, and sentenced to thirty-five years as a Range II offender. Id. The supreme court remanded the case with instructions that the state reinstate its original plea offer for good faith negotiations. Id. at 667. If the parties failed to reach an agreement, or if the trial judge would not approve it, the defendant would receive a new trial. Id.

The state seeks to distinguish Harris because the defendant here instructed his counsel that he would not agree to enter a plea of guilt. The state also points out that in Harris, the offer was thirty years less than the actual sentence; here, the offer and the sentence differ by only six years.

In Harris, our supreme court found ineffective assistance of counsel where there was a complete breakdown in communication between counsel and client:

> This standard of proving prejudice requires only a showing of 'a reasonable probability ... sufficient to undermine confidence in the outcome.' There is no doubt that the prejudice suffered by defendant was the direct result of failure on the part of defense counsel to discuss the plea bargain offer with his client and his failure to respond timely to the State's offer.

Id. at 665. According to the court, the record in Harris demonstrated both incompetence and prejudice. Id. The trial judge observed, "There is no question that the defendant was denied the opportunity of accepting or rejecting the plea and that there is a great chasm or gap in the sentence of five (5) years in the plea offer and the thirty-five (35) years imposed by the Court." Id. at 664. Harris had argued that failure to communicate the plea offer was deficient representation and that the

28

disparity in the two sentences was manifestly prejudicial. Our supreme court did not, however, expressly address how Harris had satisfied the prejudice prong required under the Strickland rule. See State v. Lester D. Herron, C.C.A. No. 03C01-9109-CR-00284, slip op. at 11 (Tenn. Crim. App., at Knoxville, Mar. 10, 1992) (holding failure of counsel to preserve defendant's right to appellate review did not require showing of prejudice before a delayed appeal could be granted). Nor did the court base its conclusion on any assertion by the petitioner that he would have accepted the plea offer had he known about it. Harris, 875 S.W.2d at 665; cf. Turner v. Tennessee, 858 F.2d 1201,1206 (6th Cir. 1988) (holding the defendant must prove that but for counsel's error, there is a reasonable probability he would have accepted the guilty plea offer). In fact, the record established that Harris had already rejected an offer of a Range I, nine-year sentence. Harris, 875 S.W.2d at 664.

Moreover, a plea agreement is not enforceable until approved by the trial court. Id. at 666. In Harris, the post-conviction trial judge clearly stated on the record that he would not have approved a five-year sentence due to the "aggravated facts" of the case. Id. at 664. Nonetheless, our supreme court reversed the conviction and remanded the cause with instructions that the state reinstate its original guilty plea offer and otherwise negotiate in good faith. If an agreement could not be reached by the parties and then approved by the trial judge, the case would proceed to trial. Id. at 665, 667.

In our view, Harris controls. Trial counsel's failure to communicate the plea offer to the defendant requires a grant of relief despite the trial court's conclusion, based upon trial counsel's testimony, that the defendant would not likely have accepted the offer anyway. The state must reinstate its original guilty plea

29

offer and negotiate in good faith. Should the parties fail to reach a plea agreement or should the trial court refuse to approve it, there shall be a new trial.

IV

The defendant makes a general challenge to the constitutionality of the solicitation statute and also argues that it was unconstitutionally applied by the trial court in the instructions to the jury. The defendant also complains that the statute in question is vague and overbroad. The state disagrees.

Initially, trial courts are charged with upholding the constitutionality of statutes where possible. Dykes v. Hamilton County, 191 S.W.2d 155, 159 (Tenn. 1945); State v. Joyner, 759 S.W.2d 422, 425 (Tenn. Crim. App. 1987). The constitutional test for vagueness is whether a statute's prohibitions are not clearly defined and thus are susceptible to different interpretations as to what conduct the statute actually proscribes. State v. Forbes, 918 S.W.2d 431, 447-48 (Tenn. Crim. App. 1995); see Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298 (1972); Baggett v. Bullitt, 377 U.S. 360, 367, 84 S. Ct. 1316, 1320 (1964). In contrast, the constitutional test for overbreadth is whether the statute's language overreaches unlawful conduct and encompasses activity that is constitutionally protected. Forbes, 918 S.W.2d at 448; Grayned, 408 U.S. at 114-15, 92 S. Ct. at 2302-03. Under our principles of due process, an overbroad or vague statute is vulnerable to a constitutional challenge because it (1) fails to provide fair notice that certain activities are unlawful; and (2) fails to establish reasonably clear guidelines for law enforcement officials and courts, which in turn invites arbitrary and discriminatory enforcement. Forbes, 918 S.W.2d 448; see Rose v. Locke, 423 U.S. 48, 49-50, 96 S. Ct. 243, 243-44 (1975); Smith v. Goguen, 415 U.S. 566, 572-73, 94 S. Ct. 1242, 1246-47 (1974).

30

The statute challenged by the defendant provides as follows:

> (a) Whoever, by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation.
> (b) It is no defense that the solicitation was unsuccessful and the offense solicited was not committed....

Tenn. Code Ann. § 39-12-102.

A statute is not unconstitutionally vague where the "meaning of the statutory provision is clear and unambiguous [and a]ny person of ordinary intelligence would have no difficulty in discerning the proscribed activity." State v. Ash, 729 S.W.2d 275, 280 (Tenn. Crim. App. 1986); see United States v. Harriss, 347 U.S. 612, 617, 74 S. Ct. 808, 812 (1954); Giaccio v. Pennsylvania, 382 U.S. 399, 402-403, 86 S. Ct. 518, 520-521 (1966). To establish that a statute is overbroad, one must demonstrate from the "text of the law and actual fact that there are a substantial number of instances where the law cannot be applied constitutionally." State v. Lyons, 802 S.W.2d 590, 593 (Tenn. 1990); New York State Club Ass'n v. City of New York, 487 U.S. 1, 108 S. Ct. 2225, 2234 (1988) (citing Broadrick v. Oklahoma, 413 U.S. 601, 93 S. Ct. 2908 (1973)).

In our view, the statute is neither vague nor overbroad. Initially, the terms are clear and unambiguous, provide reasonable notice of what conduct is prohibited, and satisfy the requirements of due process. Secondly, we reject the defendant's claim that "[t]he mental gymnastics are endless if on[e] tries to define an 'attempted solicitation' which is apparently two steps removed from the underlying substantive offense which never happened." Because the defendant is not charged with attempted solicitation, he has no standing to challenge that portion of the

31

statute. "[A] person has no standing to contest the constitutionality of a statutory provision unless the provision[] he claims to be deficient has been used to deprive him of his rights." State v. Purkey, 689 S.W.2d 196, 201 (Tenn. Crim. App. 1984); State v. Vanzant, 659 S.W.2d 816 (Tenn. Crim. App. 1983); State v. Pritchett, 621 S.W.2d 127 (Tenn. 1981). Moreover, the defendant has failed to provide examples of law and fact that demonstrate how the statute infringes on lawful, constitutionally protected activity.

Finally, the defendant alleges that the statute is unconstitutional as applied because the trial court revised its language in providing the jury instructions in an effort to resolve what it perceived to be an ambiguity. The state points out that the statute merely provides various alternative methods of accomplishing solicitation and that the court simply tailored its instruction to more closely coincide with the indictment. The indictment provides as follows:

> [The defendant] on the ___ day of September, 1993, in Bledsoe County ... did unlawfully, intentionally, and by means of oral communication request and solicit one Joanne Schuller to commit the criminal offense of First Degree Murder on the person of Charles Coward with the intent on the part of the said [defendant] that the said offense of First Degree Murder so requested and solicited be committed ....

The trial judge charged the jury, in pertinent part, as to the essential elements of solicitation:

> That the Defendant by means of oral, written, or electronic communications directly or through another, requested another to commit the offense of first degree murder of Charles Coward with the intent that the offense of first degree murder be committed.

A person is guilty of solicitation "who[], by means of oral written or electronic communication, directly or through another, <u>intentionally commands, requests or hires</u> another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be

32

committed ...." Tenn. Code Ann. § 39-12-102(a) (emphasis added). The offense of solicitation requires "(1) the intent that a criminal offense be committed; and (2) the <u>willful</u> communication of ... that intent to another in the form of a solicitation, request, command, or hiring." <u>Lee</u>, 618 S.W.2d at 324 (emphasis added).[5] By comparing the language of the statute to the jury instruction, we conclude that the trial court omitted the mens rea of intent which necessarily modifies request.

The trial judge is under a constitutional obligation to "declare the law" in the jury instructions. Tenn. Const., art VI, § 9. The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. <u>State v. Harbison</u>, 704 S.W.2d 314, 319 (Tenn. 1986). It is presumed that the jury follows the instructions of the trial court. <u>State v. Blackmon</u>, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985); <u>Klaver v. State</u>, 503 S.W.2d 946 (Tenn. Crim. App. 1973). Our supreme court requires a review of the jury charge in its entirety in order to determine if instructions are erroneous. <u>State v. Hodges</u>, 944 S.W.2d 346, 352 (Tenn. 1997). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." <u>Id.</u> Our law requires that all of the elements of each offense be described and defined in connection with that offense. <u>State v. Cravens</u>, 764 S.W.2d 754, 756 (Tenn. 1989).

The trial court omitted the word "intentionally," the mens rea requirement of the request. This request, an essential element of the charge, must be purposeful with the aim to accomplish the desired result. In the words of the

---

[5]This articulation of the elements of solicitation interpreted the 1973 version of our statute, see Tenn. Pub. Acts., ch. 62 (April 4, 1973), which provided: "Whoever, by means of oral, written, or electronic communication, directly or through another, willfully solicits, commands, requests, or hires another to commit a criminal offense, or attempts to solicit, command, request, or hire another to commit a criminal offense, with the intent that the criminal offense solicited be committed is guilty of the offense of solicitation." However, the statutes are substantially the same with the primary difference being the replacement of "willfully" with "intentionally."

Sentencing Commission the defendant must "intentionally try to enlist another in criminal activity," as opposed to the making of an inquiry without any serious intent. The defendant's strategy in defense centered on his lack actual intent. While conceding that he communicated with Joanne Kurth about hiring someone to kill Coward, the defendant contended that he was simply playing along and that he never seriously intended to request the murder of Coward or that Coward be harmed. In our view, under these facts, the mens rea of the offense was sufficiently fundamental to the elements of the crime and the defense theory that a failure to charge the jury that the request must be intentional requires a new trial. The error here requires that remedy.

V

In his final issue, the defendant asserts that the trial judge erred in charging the jury as to the appropriate sentencing classification and range of punishment he could be required to serve if convicted. The trial court charged that the defendant was a multiple offender and the instruction was based on a Range II sentence of twelve to twenty years for a Class B felony:

> (a) A "multiple offender" is a defendant who has received:
>   (1) A minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes....
>                    ***
>   (4) Convictions for multiple felonies committed as part of a single course of conduct within twenty-four (24) hours, constitute one (1) conviction for the purpose of determining prior convictions....

Tenn. Code Ann. § 40-35-106.

At the time of trial, the defendant had two prior Class C felony convictions resulting from guilty pleas entered in Knox County; these convictions

34

place the defendant within the multiple offender definition. Tenn. Code Ann. § 40-35-106(a). Although he appealed the sentences, his convictions were the result of pleas of guilt and would be unaffected by his appeal. The defendant argues that these convictions were the result of a single course of conduct within twenty-four hours and should be counted as only one conviction. We disagree. According to the stipulation of proof entered at the submission hearing, one theft occurred in May of 1991; the other theft occurred over several months from August of 1990 to May of 1991 and involved numerous unlawful transactions. Thus, the defendant was properly categorized a multiple offender.

The sentencing range for Range II, multiple offender convicted of solicitation to commit first degree murder, a Class B felony, is not less than twelve and not more than twenty years. The trial judge properly instructed the jury.

The judgment of the trial court must be reversed. This cause is remanded to the trial court for reinstatement of the guilty plea offer of Range I, ten years to be served consecutively to the sentences in Knox County. The state is directed to negotiate in good faith. If the trial court refuses to approve a plea agreement, or if no agreement can be reached, the defendant shall receive a new trial.

_____
Gary R. Wade, Judge

35

CONCUR:

_____
Paul G. Summers, Judge


_____
William M. Barker, Judge