# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 13, 2014 Session

## STATE OF TENNESSEE v. CHARLES A. KENNEDY

**Appeal from the Circuit Court for Williamson County**
**No. II-CR096724      James G. Martin, III, Judge**

_____

**No. M2013-02207-CCA-R9-CD - Filed October 3, 2014**

_____

In this interlocutory appeal by the State, the State challenges the trial court's suppression of the results of blood alcohol testing conducted on the defendant's blood pursuant to Tennessee Code Annotated section 55-10-406(f)(2) (Supp. 2012), claiming that the trial court erred by declaring Code section 55-10-406(f)(2) unconstitutional and by ruling that no exception to the warrant requirement existed to justify the warrantless taking of the defendant's blood. Because Code section 55-10-406(f)(2) does not mandate the warrantless taking of a blood sample, the trial court erred by declaring the statute unconstitutional, and that portion of the judgment is reversed. Because no exception to the warrant requirement justified the warrantless taking of the defendant's blood in this case, however, we affirm the trial court's order suppressing the results of blood alcohol testing conducted on the sample.

**Tenn. R. App. P. 9; Judgment of the Circuit Court Reversed in Part; Affirmed in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Kim R. Helper; District Attorney General; and Carlin Hess, Assistant District Attorney General, for the appellant, State of Tennessee.

Benjamin C. Signer, Franklin, Tennessee, for the appellee, Charles A. Kennedy.

## OPINION

The Williamson County grand jury charged the defendant with one count of driving under the influence ("DUI"), one count of driving while the blood alcohol

concentration ("BAC") in the defendant's blood was .08 percent or more ("DUI per se"), one count of driving while his driver's license was revoked, and third offense DUI. Prior to trial, the defendant moved the trial court to suppress the results of blood alcohol testing conducted on blood drawn against his will. The defendant asserted that Code section 55-10-406(f)(2), the statute the State had used to justify the blood draw, was unconstitutional and that no exception to the warrant requirement justified the warrantless blood draw. The State claimed that exigent circumstances justified the warrantless taking of the defendant's blood.

At the August 19, 2013 hearing on the defendant's motion, Fairview City Police Department Officer Shawn Malhoit testified that at approximately 12:30 a.m. on May 8, 2012, she was "riding with Sergeant [Pat] Stockdale on patrol" when she and Sergeant Stockdale observed a red pickup truck being driven by the defendant, whose driver's license Sergeant Stockdale knew to be revoked. Sergeant Stockdale activated his emergency equipment, and the officers "ended up following [the defendant] on to his residence where he stopped in his driveway." Officer Malhoit recalled that the defendant's residence "was less than a mile, more than half a mile" from the location where Sergeant Stockdale activated his emergency equipment. After Sergeant Stockdale confirmed that the defendant's driver's license had been revoked, the defendant was placed under arrest. She said that the defendant was arrested at approximately 12:50 a.m.

Officer Malhoit observed the defendant's "eyes to be watery," and she "could smell alcohol coming from his person," so she asked Officer William Burgess, who had arrived at the scene in the interim, to transport the defendant to the police department "where [they] would have a level ground to conduct field sobriety testing." She explained that she asked Officer Burgess to transport the defendant because Sergeant Stockdale's "vehicle doesn't have a cage for a transport." Officer Malhoit and Sergeant Stockdale followed in Sergeant Stockdale's vehicle. She said that they arrived at the police station at approximately 1:00 a.m. and that they immediately "gave [the defendant] the opportunity to do the standardized field sobriety test." She said that in response to the request, the defendant "started on another subject and ultimately ended up with a refusal." She recalled that his refusal came "[n]ot more than five minutes" after their request. At that point, the defendant "was taken into the holding cells" so that the officers "could get [the] implied consent paperwork together and go back and do it with a witness."

Officer Malhoit testified that Officer Burgess read the implied consent form to the defendant while Officer Malhoit acted as a witness. After the form was read to him, the defendant refused to submit to the testing of his BAC at 1:17 a.m., and "[t]he next course of business was to, of course, let him know that this was going to be a mandatory blood draw." She explained, "Due to the fact that [the defendant] has had prior D.U.I.'s and a revoked license, it was required that he have blood drawn even though he did refuse." She

said that the officers told the defendant that he would be transported to Williamson County Medical Center in Franklin for the purpose of having his blood drawn. In response, the defendant said "[t]hat police would have to take this blood from him by force." She described the defendant as "just agitated, upset," and "[b]elligerent."

Officer Malhoit recalled that Officer Phil Jarosz drove her and the defendant to the Williamson County Medical Center. They left the Fairview Police Department at approximately 1:30 a.m. and arrived at the Williamson County Medical Center at "right about two o'clock." When they arrived, they placed the defendant "into a seclusion room to wait for a phlebotomist to come in to draw the blood from him." She described the defendant's demeanor as "agitated, belligerent, rude." The defendant, she said, made it clear that he did not consent to the taking of his blood. She testified that it took "[p]robably close to thirty minutes" for the phlebotomist to arrive, and the defendant's blood was drawn at 2:30 a.m.

Officer Malhoit testified that in May 2012 it was not the policy of the Fairview Police Department to obtain search warrants for the drawing of blood for blood alcohol testing. She said that at that time she never considered obtaining a search warrant before taking the defendant for the blood draw because it was her "understanding of the implied consent law, that it would be mandatory." She explained that, had she sought to obtain a search warrant, she would have had to appear in person before the magistrate at the Williamson County Jail to swear out the warrant. She said that her absence would have deprived the Fairview Police Department of the service of one of the four officers on duty that night. In addition, Officer Malhoit, who was new to the department in May 2012, was not permitted to drive a patrol car, which meant that another officer would have had to drive her to the Williamson County Jail to obtain the warrant, meaning that two of the four officers on duty and one of the three patrol cars would have been occupied by the process of obtaining the warrant. She said that it would have taken more time to secure a warrant to obtain the defendant's blood.

During cross-examination, Officer Malhoit testified that there was "not very much" procedural difference between obtaining a search warrant for a blood draw and obtaining an arrest warrant or any other type of search warrant. Officer Malhoit conceded that the Fairview Police Department had recently changed its department policy to require officers to obtain search warrants for blood draws in DUI cases. She acknowledged that although she had not had occasion to obtain such a warrant, other officers in the department had, and they had had no trouble doing so. She said that the process required two patrol cars, explaining, "We have to get one in route to get ready at the hospital and one in route to the magistrate's office at the same time." She said that, as a result, the streets of Fairview were less safe.

During redirect-examination, Officer Malhoit clarified that at the time of the defendant's arrest, she was not permitted to drive a patrol car because she was new to the department.

Fairview Police Department Sergeant Pat Stockdale testified that on May 8, 2012, he and Officer Malhoit rode together in his vehicle so that he "could observe her" in conjunction with his duties as her supervising officer. He explained that at that time, Officer Malhoit "was a functioning officer" who was participating "in the field training officer program." Sergeant Stockdale testified that after Officer Malhoit arrested the defendant, he "remained in Fairview on patrol" while "Officer Malhoit proceeded on with whatever she did."

During cross-examination, Sergeant Stockdale said that the Fairview Police Department had changed its policy to require officers to obtain search warrants before obtaining blood samples from DUI suspects.

The defendant presented the testimony of Williamson County General Sessions Court Magistrate Marcia Hynes. Ms. Hynes testified that she had issued "probably a dozen" search warrants during her career. She said that officers could either come to the magistrate's office and complete the warrant paperwork or generate the paperwork on their cruiser's computer, if the cruiser is so equipped. Ms. Hynes said that when an officer comes in for a search warrant, she or any other magistrate "would automatically drop what we were doing so that we could give attention to" the warrant. She said that the entire process would take "[p]robably, twenty minutes to an hour." She said that the magistrates "try to get them in and out by giving direct attention to whatever information's been provided to us on that search warrant" but that they did "have to make copies." She said that the overnight shift could be very busy. Ms. Hynes testified that "blood draw search warrants" take precedence over other warrants.

During cross-examination by the State, Ms. Hynes testified that before April 26, 2013, no one in her office had issued a search warrant for a blood draw in a DUI case. On that date, she and others in her office underwent training "[t]o properly know what we were doing filling out a search warrant." She said that the officer is responsible for preparing the warrant and that the magistrates provide only the signature and the time. Ms. Hynes testified that her office does not accept electronic or telephonic search warrants. When asked how she might have proceeded had she been asked to issue a search warrant for a blood draw in May 2012, she said, "I don't know because we wouldn't have - we had no idea that was a procedure. . . . But I mean blood draws were all new to us." She said that it was "pretty much" the case that only one magistrate works the overnight shift.

-4-

During redirect-examination, Ms. Hynes said that no procedural difference existed between issuing a warrant to search real property and a warrant to obtain a blood sample. She said that the form was "a little bit different."

At the conclusion of this testimony, the State argued that time was "a consideration combined with the natural dissipation of alcohol in the blood stream." The prosecutor added that Officer Malhoit had no "knowledge about obtaining a search warrant." The State averred that these factors combined to create exigent circumstances that justified the warrantless search in this case. The prosecutor also argued that obtaining a search warrant was not only impractical "but nearly impossible . . . without effectively undermining the quality of the [S]tate's evidence." The defendant argued that no exigency existed.

The trial court took the motion under advisement, and, via a written order, granted the defendant's motion to suppress the evidence on grounds that the warrantless search was not justified by any exception to the warrant requirement. Specifically, the trial court concluded that the defendant did not consent to the search in this case. Addressing that version of the implied consent law in effect at the time of the defendant's arrest, the trial court noted that the statute made the taking of the defendant's blood mandatory as a consequence of his having been previously convicted of DUI. The court ruled that because the statute created a per se exception to the warrant requirement, it violated the state and federal constitutions.

In this interlocutory appeal, the State asks us to reverse the ruling of the trial court declaring Code section 55-10-406(f)(2) unconstitutional and suppressing the results of testing on the defendant's blood. At the time of the defendant's arrest, Tennessee Code Annotated section 55-10-406 provided, in pertinent part, as follows:

> (a)(1) Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests. However, no such test or tests may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having reasonable grounds to believe the person was driving while under the influence of alcohol, a drug, any other intoxicant or any combination of alcohol, drugs, or other intoxicants as prohibited by § 55-10-401, or was violating § 39-13-106, § 39-13-213(a)(2) or § 39-13-218.

. . . .

(4) (A) If such person, having been placed under arrest and then having been requested by a law enforcement officer to submit to either or both tests, and having been advised of the consequences for refusing to do so, refuses to submit, the test or tests to which the person refused shall not be given, and the person shall be charged with violating this subsection (a).

. . . .

(f)(2) If a law enforcement officer has probable cause to believe that the driver of a motor vehicle has committed a violation of § 39-13-213(a)(2), § 39-13-218 or § 55-10-401 and has been previously convicted of § 39-13-213(a)(2), § 39-13-218 or § 55-10-401 the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood. The test shall be performed in accordance with the procedure set forth in this section and shall be performed regardless of whether the driver does or does not consent to the test.

T.C.A. § 55-10-406(a)(1), (a)(4)(A), (f)(2) (Supp. 2012).[1] The State argues that Code section 55-10-406(f)(2) does not create an unconstitutional per se exception to the federal warrant requirement and that, in any event, exigent circumstances justified the taking of the defendant's blood in this case. The defendant claims that the trial court correctly deemed Code section 55-10-406(f)(2) unconstitutional and that exigent circumstances did not exist.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issue in the present appeal with these standards in mind.

---

[1] The provisions for mandatory testing under the current version of the statute are found in subsection (d)(5).

-6-

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). "The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'" *Coolidge*, 403 U.S. at 455 (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958), and *McDonald v. United States*, 335 U.S. 451, 456 (1948)). "We are not dealing with formalities. The presence of a search warrant serves a high function." *McDonald*, 335 U.S. at 455. Thus, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. *See, e.g.*, *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) ("Our cases have held that a warrantless search of the person is reasonable only if it falls within a recognized exception.").

The drawing of the defendant's blood most certainly constituted a search for purposes of the fourth amendment. "Such an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *McNeely*, 133 S. Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)); *see also Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 616 (1989) ("We have long recognized that a 'compelled intrusio[n] into the body for blood to be analyzed for alcohol content' must be deemed a Fourth Amendment search." (quoting *Schmerber v. California*, 384 U.S. 757, 767-68 (1966) (alteration in *Schmerber*))). Accordingly, we must determine whether the taking of the defendant's blood without a warrant was justified by an exception to the warrant requirement.

The proof adduced at the suppression hearing clearly indicates that Officer Malhoit believed that Tennessee Code Annotated section 55-10-406(f)(2) operated as an exception to the warrant requirement in this case. She testified that, after the defendant refused to submit to blood alcohol testing, she told him that his blood would be drawn against his will, explaining, "Due to the fact that [the defendant] has had prior D.U.I.'s and a revoked license, it was required that he have blood drawn even though he did refuse." Officer

Malhoit indicated that it was her belief at the time of the defendant's arrest that because Code section 55-10-406(f)(2) mandated the taking of the defendant's blood, she did not need not a warrant to obtain the sample. Indeed, she made no effort to obtain a warrant.

The trial court agreed that because Code section 55-10-406(f)(2) mandated the taking of a blood sample in this case, it necessarily dispensed with the warrant requirement in those cases that met the statutory prerequisites. The court concluded that because Code section 55-10-406(f)(2) created an impermissible per se exception to the warrant requirement, it was unconstitutional.

Because courts must "not decide constitutional questions unless resolution is absolutely necessary to determining the issues in the case and adjudicating the rights of the parties.'" *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) (*State v. Taylor*, 70 S.W.3d 717, 720 (Tenn. 2002)), we necessarily begin our analysis not with the constitutionality of Code section 55-10-406(f)(2) but by determining whether the warrantless taking of the defendant's blood against his will was justified by one of the generally accepted exceptions to the warrant requirement.

The generally recognized exceptions to the Fourth Amendment warrant requirement include "search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and . . . . consent to search." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (citations omitted). The State argues that exigent circumstances existed to justify the warrantless search in this case and that the defendant impliedly consented to the blood draw in this case.

*Exigent Circumstances*

"To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of circumstances." *McNeely*, 133 S. Ct. at 1559 (citing *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006); *Illinois v. McArthur*, 531 U.S. 326, 331 (2001); *Richards v. Wisconsin*, 520 U.S. 385, 391-96 (1997); *Cupp v. Murphy*, 412 U.S. 291, 296 (1973)). The Supreme Court explained:

> We apply this "finely tuned approach" to Fourth Amendment reasonableness in this context because the police action at issue lacks "the traditional justification that . . . a warrant . . . provides." *Atwater v. Lago Vista*, 532 U.S. 318, 347 n. 16 (2001). Absent that established justification, "the fact-specific nature of the reasonableness inquiry," *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), demands that we evaluate each case of

-8-

alleged exigency based "on its own facts and circumstances."
*Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357
(1931).

*McNeely*, 133 S. Ct. at 1559.

Prior to the ruling in *McNeely*, many courts, including this one, had concluded that the natural dissipation of alcohol in the blood over time created exigent circumstances in every case "involving intoxicated motorists." *State v. Michael A. Janosky*, No. M1999-02574-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Nashville, Sept. 29, 2000). In *McNeely*, however, the Supreme Court, considering the question "whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases" concluded "that it does not" and held "consistent with general Fourth Amendment principles, that exigency in this context must be determined case by case based on the totality of the circumstances." *McNeely*, 133 S. Ct. at 1556. The Court ruled,

> In those drunk-driving investigations where police officers can
> reasonably obtain a warrant before a blood sample can be drawn
> without significantly undermining the efficacy of the search, the
> Fourth Amendment mandates that they do so. *See McDonald*,
> 335 U.S. at 456 ("We cannot . . . excuse the absence of a search
> warrant without a showing by those who seek exemption from
> the constitutional mandate that the exigencies of the situation
> made that course imperative[.]").

*McNeely*, 133 S. Ct. at 1561. The Court observed that "[w]hile the desire for a bright-line rule is understandable, the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Id.* at 1564. The Court recognized "the general importance of the government's interest in this area" but concluded that the government's interest did "not justify departing from the warrant requirement without showing exigent circumstances that make securing a warrant impractical in a particular case." *Id.* at 1565. The Court acknowledged that the natural dissipation of alcohol over time could be included as a factor in the examination of the totality of the circumstances. *See id.* at 1568 ("It suffices to say that the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required.")

In this case, Officer Malhoit and Sergeant Stockdale stopped the defendant at approximately 12:30 a.m., and, after confirming that the defendant's driver's license had

-9-

been revoked and that he appeared to be intoxicated, they placed the defendant in custody at approximately 12:50 a.m. At some point, Officer William Burgess arrived at the scene, and he drove the defendant to the police department for the purpose of conducting field sobriety tests on more level ground. Officer Malhoit and Sergeant Stockdale followed in Sergeant Stockdale's vehicle.

They arrived at the Fairview Police Department at approximately 1:00 a.m., and the defendant refused to perform the field sobriety tests. The record indicates that Sergeant Stockdale, Officer Malhoit, and Officer Burgess were all present at the Fairview Police Department during this time. After he refused to perform the field sobriety tests, the defendant was then taken inside, and Officer Malhoit completed the "implied consent paperwork." After Officer Burgess read the implied consent form to the defendant, he refused all forms of blood alcohol testing at 1:17 a.m. Officer Malhoit was present during this exchange. After the defendant refused blood alcohol testing, Officer Burgess told the defendant "[t]hat police would have to take this blood by force."

Officer Malhoit recalled that Officer Jarosz transported her and the defendant to the Williamson County Medical Center. The record does not establish when Officer Jarosz arrived at the Fairview Police Department or why he, rather than Officer Burgess, transported Officer Malhoit and the defendant to the hospital. In any event, Officer Malhoit recalled that they left the police department at approximately 1:30 a.m. and arrived at the hospital "right around two o'clock." After a 30 minute wait for a phlebotomist, the defendant's blood was drawn at 2:30 a.m., two hours after police stopped his vehicle. During this last 30-minute period, both Officers Malhoit and Jarosz stayed with the defendant.

Officer Malhoit candidly admitted that she made no attempt to obtain a search warrant, saying that she believed Code section 55-10-406(f)(2) authorized the warrantless taking of the defendant's blood. She testified that, at the time of the defendant's arrest, she had applied for search warrants in other cases, but she had never applied for a search warrant to draw blood in a DUI case. She said that, because she was a provisional officer at the time, she was not authorized to drive a patrol car, which meant that another officer would have had to drive her to the Williamson County Jail to apply for a warrant in this case. She admitted that, since the defendant's arrest, the Fairview Police Department had changed its policy to require that search warrants be obtained for mandatory blood draws in DUI cases. Under the new policy, one officer drives the suspect to the hospital while the other goes to secure the warrant. She said that implementing that procedure in the defendant's case would have left a single officer on patrol.

Ms. Hynes testified that officers were required to appear in person to obtain warrants in Williamson County but that the officers could generate warrant paperwork in

those patrol cars equipped with computers. She said that the process to obtain a search warrant generally took between 20 minutes and an hour. Ms. Hynes emphasized that the magistrates attempted to work as quickly as possible to get the officers "in and out." She said that at the time of the defendant's arrest, no procedure existed for issuing a search warrant for a blood draw in a DUI case. She testified that although she was not working on the night of the defendant's arrest, it was the general practice of the Williamson County Jail to have only a single magistrate working the third shift.

The trial court concluded that the State failed to establish that exigent circumstances existed to justify the warrantless taking of the defendant's blood, and, based on *McNeely*, we agree with the judgment of the trial court.

We recognize that, in this case as in *McNeely*, the State bore a particularly difficult burden in trying to establish the existence of exigent circumstances when the exigent circumstances exception was not the original justification for the warrantless blood draw. *See McNeely*, 133 S. Ct. at 1567 (observing that the arresting officer "made no effort to obtain a search warrant before conducting the blood draw even though he was 'sure' a prosecuting attorney was on call and even though he had no reason to believe that a magistrate judge would have been unavailable"). That said, the record simply does not show any exigency sufficient to justify Officer Malhoit's failure to obtain a warrant before causing the defendant's blood to be drawn in this case.

The State argues that the natural dissipation of alcohol in the defendant's blood combined with the additional time required to obtain a search warrant resulted in exigent circumstances that justified the warrantless taking of the defendant's blood. The record, however, does not support the State's argument that obtaining a warrant in this case would have required significantly more time than the warrantless blood draw. Officer Malhoit testified that, because she was not permitted to drive a patrol car at the time of the defendant's arrest, another officer would have had to transport her to the Williamson County Jail to obtain the search warrant. She said that having one officer transport her to the jail while another transported the defendant to the hospital would have resulted in only one officer patrolling the streets of Fairview, a circumstance she claimed never happened. She iterated that the "absolute minimum" number of cars patrolling Fairview at any given time "is two." This testimony, however, is belied by the facts in this case.

The record establishes that, at the time that the defendant refused to perform field sobriety tests, Officers Malhoit and Burgess along with Sergeant Stockdale were at the Fairview Police Department. This is true because Sergeant Stockdale drove Officer Malhoit to the police department while Officer Burgess transported the defendant. Sergeant Stockdale testified that he went back on patrol after the defendant's arrest, but Officer

Malhoit indicated that he was present during the defendant's refusal to perform field sobriety tests. She said that she asked Sergeant Stockdale to speak with the defendant after the defendant complained of the tightness of his handcuffs. Given the testimony by Officer Malhoit and Sergeant Stockdale that only four officers were on duty that night, the presence of the three officers at the police department during the defendant's refusal to submit to field sobriety tests necessarily meant that a single officer, Officer Jarosz, remained on patrol. The record establishes that both Officers Malhoit and Burgess remained at the police department after the defendant refused field sobriety tests and at least until the defendant refused blood alcohol testing. Indeed, Officer Burgess explained to the defendant that his blood would be drawn by force. The record does not indicate when Officer Jarosz arrived at the police department, only that he was there in time to transport Officer Malhoit and the defendant to the hospital at 1:30 a.m.

The State fails to explain why it would have been impossible for Officer Burgess to transport the defendant to the hospital while Sergeant Stockdale transported Officer Malhoit to the jail to obtain a search warrant, leaving Officer Jarosz on patrol. The only statement offered on this point was that the streets of Fairview would be "less safe." Such an arrangement, however, would not have left the streets of Fairview any less safe than they were during the defendant's refusal to perform field sobriety tests. The State also does not explain why it would have been impossible for Officer Jarosz to transport the defendant to the hospital while Officer Burgess transported Officer Malhoit to the jail to obtain a warrant, leaving Sergeant Stockdale on patrol. That arrangement would have mimicked the circumstances when Officers Malhoit, Burgess, and Jarosz were at the police department following the defendant's refusal to submit to blood alcohol testing.

That Officer Malhoit may not have known how to apply for a warrant for a blood draw in a DUI case should not, in our view, weigh in favor of a finding of exigent circumstances in this case. Officer Malhoit acknowledged having applied for search warrants in other cases, and she testified that the process for applying for a blood draw search warrant was not that different. Additionally, Ms. Hynes testified that a warrant could be obtained from the Williamson County Jail in as little as 20 minutes and that the magistrates gave priority to blood draw search warrants. Although the State presented testimony about the magistrates' lack of experience with search warrants in DUI cases at the time of the defendant's arrest, no testimony suggested that obtaining a warrant *on the night of the defendant's arrest* would have taken a greater amount of time than the 20 minutes to one hour common in other cases.

As the Supreme Court observed, "other factors present in an ordinary traffic stop, such as the procedures in place for obtaining a warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore

-12-

may establish an exigency that permits a warrantless search." The State, however, did not present proof of the availability of a magistrate *at the time of the defendant's arrest*. The defendant refused voluntary blood alcohol testing at 1:17 a.m., and his blood was not drawn until 2:30 a.m. Ms. Hynes testified that it was "[p]retty much" the case that a single magistrate worked the overnight shift and that when she worked that shift, the magistrates "were very busy" on some nights. No testimony, however, established the exact number of magistrates working on the night of the defendant's arrest or the relative business of the night.

In sum, the State simply failed to establish the existence of exigent circumstances justifying the warrantless blood draw in this case.

### *Consent*

The State also claims that the defendant, by virtue of operating a motor vehicle on the roadways in this state, impliedly consented to the warrantless blood draw. The State argues that although our implied consent statute generally provides that blood alcohol testing will not be conducted when a driver refuses the test, the right to refuse warrantless blood alcohol testing is statutory in nature and can be limited as the legislature sees fit. Essentially, the State contends that the implied consent provided by driving a motor vehicle cannot be revoked when certain statutory criteria are met, such as the criteria in Code section 55-10-406(f)(2). The State has waived our consideration of this argument, however, by failing to present it in the trial court. "An issue not raised at trial may not be raised for the first time on appeal." *In re Estate of Smallman*, 398 S.W.3d 134, 148 (Tenn. 2013); *see also, e.g.*, Tenn. R. App. P. 36(a) ("[R]elief may not be granted in contravention of the province of the trier of fact. Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *Welch v. Bd. of Prof'l Responsibility for the Supreme Court of Tenn.*, 193 S.W.3d 457, 465 (Tenn. 2006) ("'It has long been the general rule that questions not raised in the trial court will not be entertained on appeal.'" quoting *Adoption of Female Child, E.N.R.*, 42 S.W.3d 26, 32-33 (Tenn. 2001)); *State v. Maddin*, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005) ("When an issue is raised for the first time on appeal, it is typically waived."). Because the State failed to present this argument in the trial court, the trial court did not have the opportunity to pass on it, and we will not consider it.

### *Tennessee Code Annotated § 55-10-406*

Because we can find no other justification for the warrantless taking of the defendant's blood, we turn to the justification used by Officer Malhoit, Code section 55-10-

406(f)(2).  As previously indicated, at the time of the defendant's arrest, Tennessee Code Annotated section 55-10-406 provided, in pertinent part, as follows:

> (a)(1) Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests.  However, no such test or tests may be administered pursuant to this section, unless conducted at the direction of a law enforcement officer having reasonable grounds to believe the person was driving while under the influence of alcohol, a drug, any other intoxicant or any combination of alcohol, drugs, or other intoxicants as prohibited by § 55-10-401, or was violating § 39-13-106, § 39-13-213(a)(2) or § 39-13-218.
>
> . . . .
>
> (4) (A) If such person, having been placed under arrest and then having been requested by a law enforcement officer to submit to either or both tests, and having been advised of the consequences for refusing to do so, refuses to submit, the test or tests to which the person refused shall not be given, and the person shall be charged with violating this subsection (a).
>
> . . . .
>
> (f)(2) If a law enforcement officer has probable cause to believe that the driver of a motor vehicle has committed a violation of § 39-13-213(a)(2), § 39-13-218 or § 55-10-401 and has been previously convicted of § 39-13-213(a)(2), § 39-13-218 or § 55-10-401 the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood.  The test shall be performed in accordance with the procedure set forth in this section and shall be performed regardless of whether the driver does or does not consent to the test.

T.C.A. § 55-10-406(a)(1), (a)(4)(A), (f)(2).

Officer Malhoit believed that the statute operated as an exception to the warrant requirement, and the trial court agreed. The trial court ruled that because the legislature could not create by statute a per se exception to the warrant requirement, the statute was unconstitutional.

The most basic principle of statutory construction is "'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). "Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.'" *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004) (quoting *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000)). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." *Boarman v. Jaynes*, 109 S.W.3d 286, 291 (Tenn. 2003) (citing *State v. Nelson*, 23 S.W.3d 270, 271 (Tenn. 2000)). "It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources." *In re Estate of Davis*, 308 S.W.3d 832, 837 (Tenn. 2010) (citing *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998)). "Further, the language of a statute cannot be considered in a vacuum, but 'should be construed, if practicable, so that its component parts are consistent and reasonable.'" *In re Estate of Tanner*, 295 S.W.3d 610, 614 (Tenn. 2009) (quoting *Marsh v. Henderson*, 424 S.W.2d 193, 196 (Tenn. 1968)). This court must also "presume that . . . the General Assembly 'did not intend an absurdity.'" *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010) (quoting *Fletcher v. State*, 951 S.W.2d 378, 382 (Tenn. 1997)).

Additionally, the courts of this state must uphold the constitutionality of statutes where possible, *see Dykes v. Hamilton County*, 191 S.W.2d 155, 159 (Tenn. 1945); *State v. Joyner*, 759 S.W.2d 422, 425 (Tenn. Crim. App. 1987), always beginning review of the constitutionality of a statute "with the presumption that an act of the General Assembly is constitutional," *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003) (citing *State v. Robinson*, 29 S.W.3d 476, 479-80 (Tenn. 2000); *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997)). Moreover, a reviewing court must "'indulge every presumption and resolve every doubt in favor of the statute's constitutionality.'" *Gallaher*, 104 S.W.3d at 459 (quoting *Taylor*, 70 S.W.3d at 721).

To be sure, Code section 55-10-406(f)(2) mandated the taking of the defendant's blood in this case. *See* T.C.A. § 55-10-406(f)(2) (2012) ("[T]he officer *shall cause the driver to be tested* for the purpose of determining the alcohol or drug content of the driver's blood. *The test . . . shall be performed regardless of whether the driver does or does*

*not consent to the test*.") (emphasis added). The statute is silent, however, with regard to whether the officer must obtain a search warrant before causing the driver's blood to be tested. Importantly, a conclusion that the legislature intended to create an exception to state and federal constitutional warrant requirements would require us to declare the statute unconstitutional. As the Supreme Court has observed, "It is clear, of course, that no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973). The same axiom applies to our general assembly. *See Ybarra v. Illinois*, 444 U.S. 85, 96 n.11 (1979) ("The statute purports instead to authorize the police in some circumstances to make searches and seizures without probable cause and without search warrants. This state law, therefore, falls within the category of statutes purporting to authorize searches without probable cause, which the Court has not hesitated to hold invalid as authority for unconstitutional searches."); *see also Michigan v. DeFillippo*, 443 U.S. 31, 39 (1979) ("We have held that the exclusionary rule required suppression of evidence obtained in searches carried out pursuant to statutes, not previously declared unconstitutional, which purported to authorize the searches in question without probable cause and without a valid warrant."). Because we must "presume that the General Assembly knows the 'state of the law,'" *Lee Med., Inc.,* 312 S.W.3d at 527 (quoting *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 683 (Tenn. 2005)), we presume in this case that the legislature was aware that it could not circumvent Fourth Amendment protections by legislative enactment. In consequence, we conclude that the legislature did not intend for Code section 55-10-406(f)(2) to operate as a blanket exception to the warrant requirement.

The Texas Court of Appeals, sitting *en banc*, interpreted Texas's mandatory blood draw statute similarly. In *Kenneth Lee Douds v. State of Texas*, the court ruled that the warrantless taking of Douds's blood for blood alcohol testing, presumably under the authorization provided by Texas's implied consent statute, violated Douds's Fourth Amendment rights. *See Kenneth Lee Douds v. State of Texas*, No. 14-12-00642-CR, slip op. at 1 (Tex. App. June 5, 2014). The Texas statute at issue provided:

> A peace officer shall require the taking of a specimen of the person's breath or blood under any of the following circumstances if the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft and the person refuses the officer's request to submit to the taking of a specimen voluntarily:
>
> (1) the person was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believes occurred as a result of the offense and, at the time of the arrest, the officer reasonably believes that as a direct result

of the accident:

(A) any individual has died or will die;

(B) an individual other than the person has suffered serious bodily injury; or

(C) an individual other than the person has suffered bodily injury and been transported to a hospital or other medical facility for medical treatment;

(2) the offense for which the officer arrests the person is an offense under Section 49.045, Penal Code; or

(3) at the time of the arrest, the officer possesses or receives reliable information from a credible source that the person:

(A) has been previously convicted of or placed on community supervision for an offense under Section 49.045, 49.07, or 49.08, Penal Code, or an offense under the laws of another state containing elements substantially similar to the elements of an offense under those sections; or

(B) on two or more occasions, has been previously convicted of or placed on community supervision for an offense under Section 49.04, 49.05, 49.06, or 49.065, Penal Code, or an offense under the laws of another state containing elements substantially similar to the elements of an offense under those sections.

Tex. Transp. Code § 724.012(b). The *Kenneth Lee Douds* court first observed that "the Transportation Code does not address whether a warrant is required before obtaining a mandatory blood draw," *Kenneth Lee Douds*, slip op. at 26, and then concluded that "the statute does not mandate a warrantless blood draw," *id.*, slip op. at 27. The court emphasized, "The mandatory blood draw statute cannot—and does not purport to—alter the Fourth Amendment warrant requirement or its recognized exceptions." *Id.*, slip op. at 27-28.

We find the reasoning of the *Kenneth Lee Douds* court sound. Like the Texas Transportation Code, the mandatory blood draw statute at issue here does not address

-17-

whether a police officer must obtain a search warrant before causing a suspect's blood to be drawn. Thus, the statute is open to the interpretation that a warrant is required before a mandatory blood draw when a suspect refuses to consent to the draw. When "(1) a statute can legitimately be construed in various ways, and (2) one of those constructions presents a constitutional conflict, then 'it is our duty to adopt a construction which will sustain the statute and avoid [that] constitutional conflict, if its recitations permit such a construction.'" *State v. Mallard*, 40 S.W.3d 473, 480 (Tenn. 2001) (quoting *Marion County Bd. of Comm'rs v. Marion County Election Comm'n*, 594 S.W.2d 681, 684-85 (Tenn. 1980)). We conclude that Code section 55-10-406(f)(2) does not dispense with the warrant requirement. Accordingly, we reverse the judgment of the trial court declaring the statute unconstitutional.

*Conclusion*

Because the trial court erred by declaring Code section 55-10-406(f)(2) unconstitutional, we reverse that portion of the trial court's judgment. Because Code section 55-10-406(f)(2) did not dispense with the warrant requirement and because the State failed to establish that the defendant's blood was drawn pursuant to a recognized exception to the warrant requirement, we affirm the judgment of the trial court suppressing the results of blood alcohol testing performed on the defendant's blood.

_____
JAMES CURWOOD WITT, JR., JUDGE